IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| JOHN M. HIGGINS; CAROL HIGGINS; and WEATHERGUARD, INC., <br><br> Plaintiffs, <br><br> vs. <br><br> KENTUCKY SPORTS RADIO LLC; MATTHEW H. JONES; and DREW FRANKLIN, <br><br> Defendants. | 8:17CV367 <br><br> MEMORANDUM AND ORDER |

This matter is before the Court on defendants Kentucky Sports Radio LLC ("KSR"), Matthew H. Jones ("Jones"), and Drew Franklin's ("Franklin" and collectively, "defendants") joint Motion to Dismiss for Lack of Personal Jurisdiction or, Alternatively, Motion to Transfer Venue (Filing No. 13).  *See* Fed. R. Civ. P. 12(b)(2); 28 U.S.C. § 1404(a).  For the reasons stated below, the Motion is granted in part and denied in part, and the case is transferred to the Eastern District of Kentucky.

## I.   BACKGROUND[1]

### A.   The Parties

John Higgins ("Higgins") is a well-known basketball referee who has worked in National Collegiate Athletic Association ("NCAA") men's basketball games since 1988. Higgins is married to Carol Higgins ("Mrs. Higgins").  In 2016, Sports Illustrated Magazine published a profile of Higgins and described him as "one of the nation's most

---

[1]The factual background is derived from the allegations of the verified Complaint (Filing Nos. 1 and 17, Exhibit A), which are taken as true for purposes of the motion and are viewed in the light most favorable to plaintiffs.  *See Key Med. Supply, Inc. v. Burwell*, 764 F.3d 955, 959 (8th Cir. 2014).

visible, wanted—and loathed—basketball referees." The article also mentioned Higgins owned a roofing company known as Weatherguard, Inc. ("Weatherguard").[2]

KSR broadcasts a two-hour radio show ("show") to more than forty radio stations in Kentucky. The show is also available online through streaming platforms and as a podcast. KSR maintains the website Kentuckysportsradio.com ("Website"). Jones hosts the show and maintains a blog on the Website. Franklin is also a frequent contributor to the Website.

On March 26, 2017, Higgins officiated an NCAA basketball game between the University of Kentucky Wildcats and the University of North Carolina Tar Heels ("the game"). Kentucky lost the game on a last-second shot. After the game, many Wildcat fans began blaming the loss on the officiating.

B. Reaction to the Game

On March 27, 2017, an unknown individual created a short video titled "John Higgins [sic] Sabotage of Kentucky" ("the video") and uploaded it to the video-sharing website vimeo.com. The video showed footage of the game with Kentucky announcers discussing the officiating and ended with a photo of Higgins next to a Weatherguard truck. Written alongside the photo were Weatherguard's business phone number and website, Higgins's home phone number, and the message "Write a review of him here http:/www.facebook.com/rooferees." A link to the video was then posted on several fan websites.

Also on March 27, 2017, Jones frequently discussed Higgins's performance in the game on the show. Jones read emails from listeners, including one that stated, "I'm thinking of leaving a bad review on John Higgins' roofing Yelp page." Jones noted that people had been posting Higgins's business card online, but said he thought this was a

---

[2] The article also mentioned Higgins's real-estate management company, but that business is not involved in this case.

bad thing to do because it would be harassment.  However, later in the show, Jones read an email that stated, "I was against trolling John Higgins.  Then I went and saw the name of his roofing company."  In response to this email, Jones laughed at the name of the roofing company, "Rooferees.com," and said, "Now I still don't think you should troll the guy, but now I have less sympathy if his name is Rooferees."

The same day, KSR published several articles on its Website, including one written by Franklin titled, "No more John Higgins please."  One reader posted a link to the video in the comments section of Franklin's article.  Another reader commented, "http://www.rooferees.com/about-us/ Can we get a gofundme to put this guy on blast in Omaha?!?"  Still another commenter stated, "I put a link to this post on his website. http://www.rooferees.com."

The next day, March 28, 2017, Franklin posted an article to the Website stating, in part, "John Higgin's [sic] business is getting CRUSHED on its Facebook page.  I won't link the page because I don't completely agree with attacking his side hustle, but, man, Big Blue Nation is destroying Higgins in the comments and reviews of the business." Franklin stated, "If you can stand to watch it, here you go" and linked to the video. Franklin's second post of the day stated, "It's a busy day on KSR as Matt and Ryan . . . continue the hatred for John Higgins.  They'll have that and more on two hours of Tuesday morning KSR.  Join in on the fun by calling [the KSR call in number] (502) 571-1080."

Moments later, Franklin posted a third article titled "Kentucky fans are really lighting up John Higgins' roofing business."  Franklin said, "We . . . do not condone the activity from Big Blue Nation on John Higgins' roofing company's Facebook page. But . . . we can and we will *read* the activity on the Facebook page."  Franklin then quoted some of the Facebook entries ranging from mildly witty to downright nasty.  He finished by saying, "Okay, but seriously, Big Blue Nation: maybe stop doing this.  It's

not a good look for us, especially the handful of comments wishing death. Let's chill just a little bit. You can make fun of him all you want here, and we will." Franklin's fourth article of the day was entitled, "Call John Higgins' business and you get the FBI (or someone pretending to be the FBI)."

Also on March 28, 2017, Jones began his show by discussing Weatherguard's Facebook page. Jones averred he did not "advocate" the postings, but "it doesn't mean it's not funny." Jones claimed the postings were "not prompted by me" and "you cannot blame this on KSR. . . . Well, maybe you can because I told you he was a roofer." After stating the name of the Facebook page was "Rooferees," Jones read several of the comments while laughing at some of them. Jones said, "I give them credit. How many of those would like to potentially write for KSR?" He added, "I think fans feel like this is the only way they can express their frustration," and that the comments were a "bad idea, . . . but it is funny."

After a commercial break, Jones declared, "I can't stop reading these John Higgins reviews," and, "It looks like ten of them are five stars, and all the rest of them are one star." He read several more reviews, laughing at some of them. Jones believed that "it's human nature" to make the postings and added that the fans "are so upset about this game and they don't know another way to express it to him because they don't have a method to express" their outrage and the Facebook comments allowed them to do it. Jones thought that Higgins "opens himself up" to the comments by linking his status as a referee to his roofing company by naming the Facebook page "Rooferees." Jones told his audience that some fans had called and tweeted saying they had called Weatherguard, but Jones, after noting, "It is funny," advised them not to call. Jones closed the show by speculating on whether Higgins was gambling on the game and purposely threw the game to North Carolina.

4

### C. Damages Suffered by Weatherguard and the Higgins Family

In the two days after the game, Higgins reports Weatherguard received over 3,000 phone calls, seventy-five percent of which originated from Kentucky area codes. The many calls crashed Weatherguard's electronic voicemail system. The calls, which continued non-stop for up to two weeks, kept Weatherguard customers and potential customers from reaching the business, allegedly resulting in a loss of income. Weatherguard's Google star rating,[3] originally the highest in Omaha for a roofing company, plummeted from 4.8 out of 5 to 1.2 out of 5. Eighty one-star ratings in a twenty-four hour period came from Kentucky. In total, Higgins identified 181 false reviews. Because Google business searches are impacted by the star rating, these bogus reviews affected potential customers' ability to locate Weatherguard.

Some individuals filed false reports against Weatherguard at the Better Business Bureau. Their status as fans of Kentucky basketball is evidenced by some of the fake names that were used, such as the names of Kentucky basketball coaches. Weatherguard's Facebook page received over 700 false posts, and Weatherguard was forced to take the page down. This removed a significant part of Weatherguard's advertising and a major way in which new customers typically found Weatherguard's contact information.

Mrs. Higgins then began receiving messages on her Facebook Messenger account from unknown individuals relating to Higgins's performance in the game.

Weatherguard's contact information was entered into other businesses' websites, resulting in follow-up calls to Weatherguard from those businesses. Weatherguard's business manager's email was given to car dealers who replied to ask when the manager was going to come test-drive cars. Weatherguard also received numerous fake calls

---

[3] Google maintains pages for various businesses where customers can rate the company on a scale of one to five stars.

complaining of leaking roofs. Weatherguard employees wasted time following up on the calls, and the employees could not tell if calls were real or fake. As a result of these disruptions, Weatherguard lost business opportunities.

Disturbingly, Higgins also began anonymously receiving death threats and other highly offensive voice messages at his home and at Weatherguard. Because of these threatening messages, the Higgins family was put in fear and was forced to cancel their home telephone service and involve local police. The Sarpy County Sheriff added patrols around Weatherguard, and the Omaha Police Department added patrols around the Higgins family home. Weatherguard employees were also placed in fear, and were told not to work for several days.

## II. DISCUSSION

On October 3, 2017, Higgins, Mrs. Higgins, and Weatherguard (collectively, "plaintiffs") filed their four-count Complaint against the defendants. The plaintiffs' claims include (1) intentional infliction of emotional distress, (2) invasion of privacy, (3) tortious interference with a business relationship or expectancy, and (4) civil conspiracy.

The defendants moved to dismiss the case, claiming the Court does not have personal jurisdiction over the defendants. *See* Fed. R. Civ. P. 12(b)(2). In the alternative, the defendants requested a transfer of venue to the United States District Court for the Eastern District of Kentucky. *See* 28 U.S.C. § 1404(a).

"To survive a motion to dismiss for lack of personal jurisdiction, a plaintiff must plead 'sufficient facts to support a reasonable inference that the defendant[s] can be subjected to jurisdiction within the state.'" *Creative Calling Solutions, Inc. v. LF Beauty Ltd.*, 799 F.3d 975, 979 (8th Cir. 2015) (quoting *K-V Pharm. Co. v. J. Uriach & CIA, S.A.*, 648 F.3d 588, 591-92 (8th Cir. 2011)). "A plaintiff's prima facie showing 'must be tested, not by the pleadings alone, but by affidavits and exhibits supporting or opposing the motion.'" *Fastpath, Inc. v. Arbela Techs. Corp.*, 760 F.3d 816, 820 (8th Cir. 2014)

6

(quoting *K-V Pharm.*, 648 F.3d at 592). If the Court relies on affidavits and pleadings in a Rule 12(b)(2) motion to dismiss but does not hold a hearing, the Court "must look at the facts in the light most favorable to the nonmoving party and resolve all factual conflicts in favor of that party." *Epps v. Stewart Info. Servs. Corp.*, 327 F.3d 642, 646-47 (8th Cir. 2003).

There are two types of personal jurisdiction: general and specific. *Bristol-Myers Squibb Co. v. Super. Ct. of Cal.*, 582 U.S. ___, ___, 137 S. Ct. 1773, 1779-80 (2017). General jurisdiction over a defendant, also known as all-purpose jurisdiction, allows a court to hear any claim involving that defendant. *Id.* Specific jurisdiction, also known as case-linked jurisdiction, only gives a court jurisdiction over cases resulting from the defendant's contacts with the forum. *Id.*

"A federal court may assume jurisdiction over a defendant in a diversity action if the forum State's long-arm statute permits the exercise of personal jurisdiction and that exercise is consistent with the Due Process Clause of the Fourteenth Amendment." *Creative Calling*, 799 F.3d at 979. "Because the Nebraska longarm statute confers jurisdiction to the limits of due process, the single issue in this case is whether the exercise of personal jurisdiction over [defendants] violates due process." *Stanton v. St. Jude Med., Inc.*, 340 F.3d 690, 693 (8th Cir. 2003).[4]

To satisfy due process, "the constitutional touchstone remains whether the defendant purposefully established 'minimum contacts' in the forum State." *Burger King*

---

[4]The Nebraska Supreme Court, while acknowledging some courts allow one co-conspirator's actions to be used to gain personal jurisdiction over another co-conspirator, implicitly rejected that principle: "Due process for personal jurisdiction over a nonresident defendant requires that the plaintiff allege specific acts by the defendant which establish the defendant had the necessary minimum contacts before a Nebraska court can exercise jurisdiction over a person." *Ashby v. State*, 779 N.W.2d 343, 360 (Neb. 2010). Although the ruling was couched in an interpretation of due process, the Court considers this persuasive evidence that the Nebraska Supreme Court would not extend Nebraska's long-arm statute to reach alleged co-conspirators lacking minimum contacts.

*Corp. v. Rudzewicz*, 471 U.S. 462, 474 (1985). In *Aftanase v. Economy Baler Co.*, 343 F.2d 187 (8th Cir. 1965), the Eighth Circuit "developed a five-factor test to evaluate whether a defendant's actions are sufficient to support personal jurisdiction: (1) the nature and quality of the contacts with the forum state; (2) the quantity of those contacts; (3) the relationship of those contacts with the cause of action; (4) [the state's] interest in providing a forum for its residents; and (5) the convenience or inconvenience to the parties." *Myers v. Casino Queen, Inc.*, 689 F.3d 904, 911 (8th Cir. 2012). "[T]he first three factors are of primary importance and the last two of secondary importance." *Id*. The third *Aftanase* factor is used to distinguish between specific and general jurisdiction. *Johnson v. Arden*, 614 F.3d 785, 794 (8th Cir. 2010).

### A. General Jurisdiction

"For an individual, the paradigm forum for the exercise of general jurisdiction is the individual's domicile[.]" *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 924 (2011). "[A] court may assert jurisdiction over a foreign corporation 'to hear any and all claims against [it]' only when the corporation's affiliations with the State in which suit is brought are so constant and pervasive 'as to render [it] essentially at home in the forum State.'" *Daimler AG v. Bauman*, 571 U.S. ___, ___, 134 S. Ct. 746, 752 (2014) (quoting *Goodyear*, 564 U.S. at 919). After reviewing the Complaint and the affidavits, it is clear that none of the defendants are domiciled in Nebraska or exhibit constant and pervasive affiliations with the state.[5] While the show is available for download in Nebraska and the Website is accessible in Nebraska, these connections alone are insufficient for general jurisdiction. *See, e.g.*, *FC Inv. Group LC v. IFX Mkts., Ltd.*,

---

[5] Limited liability companies ("LLCs"), while sharing many features in common with corporations, are subject to different citizenship rules. *GMAC Commercial Credit LLC v. Dillard Dep't Stores, Inc.*, 357 F.3d 827, 829 (8th Cir. 2004). It is an open question whether LLCs are subject to the general jurisdiction rules of corporations or whether the Court looks to the domicile of the members. *See Magna Powertrain de Mex. S.A. de C.V. v. Momentive Performance Materials USA LLC*, 192 F. Supp. 3d. 824, 828 (E.D. Mich. 2016). However, because the only named members of KSR are Jones and Franklin, there is no general jurisdiction over KSR regardless of which test the Court uses.

8

529 F.3d 1087, 1092 (D.C. Cir. 2008) (stating mere accessibility of a website does not meet the minimum contacts for general jurisdiction).

### B.     Specific Jurisdiction

"The inquiry whether a forum State may assert specific jurisdiction over a nonresident defendant 'focuses on the relationship among the defendant, the forum, and the litigation.'" *Walden v. Fiore*, 571 U.S. ___, ___, 134 S. Ct. 1115, 1121 (2014) (quoting *Keeton v. Hustler Magazine, Inc.*, 465 U. S. 770, 775 (1984)). "For a State to exercise jurisdiction consistent with due process, the defendant's suit-related conduct must create a substantial connection with the forum State." *Id*. "Once it has been decided that a defendant purposefully established minimum contacts within the forum State, these contacts may be considered in light of other factors to determine whether the assertion of personal jurisdiction would comport with 'fair play and substantial justice.'" *Burger King*, 471 U.S. at 476 (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 320 (1945)). As mentioned earlier, the Eighth Circuit first uses the *Aftanase* test to determine if the required substantial connection, also known as minimum contacts, has been made with the forum state. *See Arden*, 614 F.3d at 794, 797.

The application of *Aftanase*'s third prong shows an analysis of potential specific jurisdiction is appropriate. Looking to the first prong of the *Aftanase* test, the nature and quality of each of the defendants' respective contact with Nebraska are not particularly strong. The second prong of *Aftanase*, the quantity of the contacts, is similarly weak. Most, if not all, of the damaging actions stated in the Complaint were not performed by any of the defendants but by third parties. "[The] unilateral activity of another party or a third person is not an appropriate consideration when determining whether a defendant has sufficient contacts with a forum State to justify an assertion of jurisdiction." *Helicopteros Nacionales De Colombia v. Hall*, 466 U.S. 408, 417 (1984).

The only alleged actions directly taken by the defendants were: criticizing Higgins's officiating; mentioning Weatherguard (which had been referenced in the earlier

9

Sports Illustrated article); and sharing a video that consisted primarily of Higgins's officiating performance. The final actions the plaintiffs claim provide a basis for jurisdiction relate to the defendants quoting and speaking about the comments made and actions taken by others.

The plaintiffs opine that the quoting and posting of the offensive comments (and commenting upon them) constitutes "incitement." However, the Court notes that posting news and describing it as "amusing," no matter how much it may be in poor taste or have caused harm, is not the same as actively soliciting such behavior.[6] That certain University of Kentucky fans threatened harm (anonymously) to Higgins and his family and intentionally sought to harm Higgins's business (once again anonymously) does not seem to be disputed by defendants (at least at this time). While the anonymous actions are, at best, reprehensible and cowardly, none of those actors are parties to this lawsuit.

While Nebraska does have an interest in providing a forum for the plaintiffs and is a more convenient forum for the plaintiffs because it is where the claimed damages occurred, these secondary factors are not the primary focus of the requisite personal jurisdiction analysis, nor can they alone satisfy due process. Unless there are additional reasons for specific jurisdiction, the Court lacks personal jurisdiction over the defendants.

    1.    *Zippo* Test

The Eighth Circuit has adopted the test articulated in *Zippo Manufacturing Co. v. Zippo Dot Com, Inc.*, 952 F. Supp. 1119 (W.D. Pa. 1997), for analyzing specific jurisdiction in the special cases where a defendant maintains a website accessible in the forum state. *Lakin v. Prudential Sec.*, 348 F.3d 704, 711 (8th Cir. 2003). The *Zippo* test divides websites into three categories. *Id*. at 710-11.

---

[6] Whether the alleged solicitation or encouragement of the third-party behavior is actionable is a matter better left for the transferee court.

The first category consists of "situations where a defendant clearly does business over the Internet" in the foreign jurisdiction.  *Id.* at 710 (quoting *Zippo*, 952 F. Supp. at 1124).  Personal jurisdiction is appropriate in this category because "the defendant enters into contracts with residents of a foreign jurisdiction that involve the knowing and repeated transmission of computer files over the Internet."  *Id*.

The second category consists of "situations where a defendant has simply posted information on an Internet Web site that is accessible to users in foreign jurisdictions."  *Id*.  Such passive websites that only "make information available to those who are interested in it" do not constitute sufficient contacts for personal jurisdiction.  *Id*. at 710-11 (quoting *Zippo*, 952 F. Supp. at 1124).

The final category consists of "interactive Web sites where a user can exchange information with the host computer."  *Id*. at 711 (quoting *Zippo*, 952 F. Supp. at 1124).  Those situations require the Court to analyze "the level of interactivity and commercial nature of the exchange of information that occurs on the Web site."  *Id*.  Under this analysis, only websites sufficiently analogous to those in the first category can support personal jurisdiction.  *See id*.

The Website maintains several sports blogs.  It is free of charge and conducts no business.  There are no products offered through the Website.  Readers are able to post comments on various articles published on the Website.  Thus, the Website is not interactive and is merely passive.  "Although [the plaintiffs] represent[] [the Website] as an 'interactive' website, users may actually only post information," and "[t]here is no interaction between users and a host computer; the site merely makes information available to other people."  *Arden*, 614 F.3d at 796.  The plaintiffs argue that Jones's reading of the comments on his show converts the Website to an active one, but this changes the *Zippo* test from an analysis of the nature of a website to an analysis of the

11

defendants' use of a website.[7] The Website also lacks any commercial nature. The Website does not provide specific jurisdiction under *Zippo*.

### 2. Effects Test

When an intentional tort is alleged, *Calder v. Jones*, 465 U.S. 783 (1984), requires the consideration of other factors in addition to the *Aftanase* test.[8] Under the *Calder* effects test, "Due process allows a state to assert personal jurisdiction over a defendant based on the in-state effects of defendants' extraterritorial tortious acts only if those acts '(1) were intentional, (2) were uniquely or expressly aimed at the forum state, and (3) caused harm, the brunt of which was suffered—and which the defendant knew was likely to be suffered—[in Nebraska].' *Viasystems, Inc. v. EBM-Papst St. Georgen GmbH & Co., KG*, 646 F.3d 589, 594 (8th Cir. 2011) (quoting *Arden*, 614 F.3d at 796). The *Calder* effects test is construed narrowly. *Arden*, 614 F.3d at 797.

First, the *Calder* effects test requires a defendant's acts to be tortious. The Court assumes, for purposes of this motion, the factual allegations in the Complaint taken as true are legally sufficient to support at least some of plaintiffs' tort claims.

Second, the defendants' acts were likely intentional. The plaintiffs suffered harm in Nebraska, and it was reasonably foreseeable that the harm was likely to be suffered in Nebraska.

Therefore, the crucial element to consider is whether the defendants' actions were uniquely or expressly aimed at Nebraska. It is important to keep in mind that "our

---

[7]Even if the Website were interactive in this way, it is still far enough from "active contract formation and repeated transmission of computer files" to constitute grounds for personal jurisdiction.

[8]"In relying on *Calder*, we do not abandon the five-part test of [*Aftanase*]. We simply note that *Calder* requires the consideration of additional factors when an intentional tort is alleged." *Dakota Indus. v. Dakota Sportswear, Inc.*, 946 F.2d 1384, 1391 (8th Cir. 1991).

'minimum contacts' analysis looks to the defendant's contacts with the forum State itself, not the defendant's contacts with persons who reside there." *Walden*, 571 U.S. at ___, 134 S. Ct. at 1122.

In *Arden*, an individual in Colorado posted on www.ComplaintsBoard.com, a review website, that the plaintiffs "operated from Unionville, Missouri, where they killed cats, sold infected cats and kittens, brutally killed and tortured unwanted cats and operated a 'kitten mill' in Unionville, Missouri." *Arden*, 614 F.3d at 796. The Eighth Circuit held that the postings did not target the State of Missouri "Additionally, even if the effect of [the defendant's] alleged statement was felt in Missouri, we have used the *Calder* test merely as an additional factor to consider when evaluating a defendant's relevant contacts with the forum state." *Arden*, 614 F.3d at 796.

The Court again stresses that the vast majority of the alleged actions, and almost all of the damaging and potentially tortious comments and phone calls, were done by third parties. Even after considering *Calder* in conjunction with *Aftanase*, and assuming the defendants' actions were tortious for the purposes of *Calder*, the Court concludes it lacks specific jurisdiction over the defendants. Because exercising specific jurisdiction in this case would violate due process, it is unnecessary to determine if jurisdiction also comports "with 'fair play and substantial justice.'"

### C. Transfer

"Whenever a civil action is filed in a [district court] . . . and that court finds that there is a want of jurisdiction, the court shall, if it is in the interest of justice, transfer such action" to any court where the action could have originally been brought. 28 U.S.C. § 1631. "Want of jurisdiction" as used in § 1631 includes the lack of personal jurisdiction. *See Johnson v. Woodcock*, 444 F.3d 953, 954 n.2 (8th Cir. 2006). The defendants acknowledge they are each subject to personal jurisdiction in Kentucky and, in the interest of justice, the Court will transfer the action there.

## III. CONCLUSION

The Court clearly lacks general jurisdiction over the defendants. Neither the *Zippo* test nor the *Calder* effects test provides specific jurisdiction. After analyzing the *Aftanase* factors, none of the defendants are subject to personal jurisdiction in Nebraska. Thus, it is in the interest of justice to transfer the case to a jurisdiction that can obtain personal jurisdiction over each of the defendants. *See* 28 U.S.C. § 1631. Accordingly,

IT IS ORDERED:

1. Defendants' Motion to Dismiss for Lack of Personal Jurisdiction or, Alternatively, Motion to Transfer Venue (Filing No. 13) is granted in part and denied in part.
2. Pursuant to 28 U.S.C. § 1631, and in the interests of justice, this matter shall be transferred to the United States District Court for the Eastern District of Kentucky.
3. The Clerk of the Court is directed to take all necessary steps to transfer this matter.

Dated this 5th day of January, 2018.

BY THE COURT:

Robert F. Rossiter, Jr.
United States District Judge