UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
**CENTRAL DIVISION at LEXINGTON**

| | | |
|---|---|---|
| JOHN M. HIGGINS, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. |
| | ) | 5:18-cv-043-JMH |
| v. | ) | |
| | ) | **MEMORANDUM OPINION** |
| KENTUCKY SPORTS RADIO, LLC, | ) | **AND ORDER** |
| *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

\* \* \*

This case presents a familiar situation where some sports fanatics overreacted about the outcome of a basketball game. In this instance, some fans and observers of the 2017 March Madness Elite Eight basketball game involving the University of Kentucky and University of North Carolina men's college basketball teams were upset about the outcome of the game. Whether deserved or not, much of the anger and blame was eventually directed at John Higgins, a well-known NCAA college basketball official and one of the officials on the three-person officiating crew for the 2017 Elite Eight game between Kentucky and North Carolina.

But post-game gripes and snarky remarks that were initially innocent enough quickly turned into something more sinister and unfortunate. Some angry fans and observers incessantly contacted the Plaintiffs directly, resulting in thousands of calls to Mr. Higgins's home and business within a span of a few days. Additionally, many individuals posted false reviews of Mr.

Higgins's business online and posted reviews about Higgins on social media ranging from satirical to nasty. And they piled on, some individuals even contacted Mr. Higgins's family and made death threats.

Understandably feeling aggrieved, the Plaintiffs pointed their fingers squarely at the Defendants in this action, including Kentucky Sports Radio, a company primarily devoted to coverage of University of Kentucky sports. In the days after the game, Kentucky Sports Radio, Matt Jones, and Drew Franklin relentlessly discussed the officiating in the Elite Eight game, including publicizing their perception that Mr. Higgins was at least partially responsible for Kentucky's loss. Additionally, the Defendants discussed the Higgins' business and read and posted reviews and comments from angry fans on various media platforms.

In response, the Plaintiffs assert that the Defendants indirectly recruited an army of willing and upset fans to attack the Plaintiffs, in retribution for Mr. Higgins's role in officiating the Elite Eight contest. Moreover, the Plaintiffs question the journalistic integrity of the Defendants and contend that any efforts of the Defendants to call off the onslaught of angry fans was disingenuous at best.

Still, while Plaintiffs' frustration is understandable and their damages are real, in some instances the First Amendment to the United States Constitution provides special protection to

2

speech on matters of public concern, even if that speech is revolting and upsetting.   In this instance, after reviewing the entire record and considering the content, form, and context of the allegedly tortious speech, the Court has reached the conclusion that Defendants' speech, broadcast in various forms on radio, television, and the internet, involved matters of public concern. Thus, the speech enjoys special protection and the First Amendment prevents the Plaintiffs from using tort actions to silence and punish the Defendants for engaging in protected speech.   As a result, the Plaintiffs may not recover on the claims pleaded in the amended complaint and the claims must be **DISMISSED WITH PREJUDICE.**

## I. Procedural and Factual Background

While the parties frame the facts differently, the relevant facts in this action are mostly undisputed.  Plaintiff John Higgins is a well-known National Collegiate Athletic Association ("NCAA") basketball official.  Mr. Higgins is also President and co-owner of a company called Weatherguard, a commercial and residential roofing, siding, and gutter contractor.  [DE 55, Amended Complaint at 2, Pg ID 585].  Carol Higgins is co-owner, vice-president, secretary, and treasurer of Weatherguard.  [*Id.*].

Defendant Kentucky Sports Radio ("KSR") is a limited liability company organized under the laws of the Commonwealth of Kentucky.  Defendant Matt Jones is the founder, organizer, and a

3

member of KSR.  Jones hosts a radio program on KSR and maintains a blog on the KSR website.  KSR programming, which generally contains coverage of University of Kentucky sports, especially men's basketball and football, is broadcast to more than forty affiliate radio stations in Kentucky and is available online through streaming platforms and podcasts.  Defendant Drew Franklin is also a frequent contributor on KSR programs and the KSR website.

## A.   Post-Game Reaction and Commentary

On March 26, 2017, Mr. Higgins was part of a three-person officiating crew for an NCAA tournament "Elite Eight" game between the University of Kentucky and University of North Carolina men's basketball teams.  [*Id.* at 3, Pg ID 586].  Kentucky lost the game. After the game, some observers, including many University of Kentucky basketball fans, criticized Mr. Higgins's officiating.

For instance, KSR host Matt Jones disparaged Higgins during the UK Post-Game Show after the Elite Eight game.  Jones stated,

> I do think the officiating the first half was putrid.
> And John Higgins has been a part of some of Kentucky's
> most painful losses. And I can tell you, I was sitting
> behind . . . [the] UK bench for the first half, . . .
> and [Kentucky Coach John Calipari] was not a happy camper
> with Higgins, . . . I get the feeling that that is not
> one of his favorite people and, you know, you heard in
> the postgame press conference, Cal said he thought they
> kind of got jobbed [sic] in the officiating . . . .[1]

---

[1] The quoted language is produced as written in Plaintiffs' amended complaint [DE 55].  It is unclear to whether Mr. Jones said "jobbed" or said robbed on the radio program.  Regardless, the substantive meaning of Mr. Jones's comment is substantially the same.

4

[*Id.* at 4, Pg ID 587].

The next day, on March 27, 2017, an unknown individual created a video titled "John Higgins [sic] Sabotage of Kentucky" and uploaded the video to the video sharing platform, vimeo.com. [*Id.*]. The video showed footage of the Elite Eight game with overlaid commentary from UK Sports Radio announcers discussing and criticizing the officiating during the game. [*Id.*]. The video ended with a photo of Higgins standing next to a Weatherguard truck. [*Id.*]. Written alongside the photo were Weatherguard's telephone number, Weatherguard's website URL, the Higgins' home telephone number, and the following message, "Write a review of him here http://www.facebook.com/rooferees." [*Id.*].

Moreover, on March 27, Jones frequently discussed Higgins's officiating performance in the Elite Eight game on the KSR radio program. Jones read emails from listeners, including one from "Anthony" stating, "I'm thinking of leaving a bad review on John Higgins's roofing Yelp page." [*Id.*]. Jones also noted that people had been publicly posting Higgins's business card online. Still, Jones claims that he told viewers not to get into the officials' private lives and discouraged listeners from contacting Higgins and his business. [DE 29, Answer at 6, Pg ID 203].

Later in the radio broadcast, Jones read another email from an unknown listener that said, "I was against trolling John

Higgins. Then I went and saw the name of his roofing company." [DE 55 at 5, Pg ID 588]. In response to the email, Jones said, "Oh my goodness, you know what his roofing company['s] name is? . . . Rooferees . . . Seriously. The name of his company is rooferees.com." [*Id.*]. Then, Jones proceeded to spell the name of the company's website address on the KSR radio broadcast, stating, "R-O-O-F-E-R-E-E-S.com. Rooferees." [*Id.*]. Finally, Jones ended the conversation by saying, "Now I still don't think you should troll the guy but now I have less sympathy if his [company's] name is Rooferees." [*Id.*].

Additionally, several articles were posted on the KSR website on March 27, 2017. One of the articles, written by Drew Franklin, was titled "No more John Higgins please." Drew Franklin, *No more John Higgins please.*, Kentucky Sports Radio, Mar. 27, 2017, http://kentuckysportsradio.com/basketball-2/no-more-john-higgins-please/. A photo of Higgins was included below the article's title. The photo included the international prohibition sign over Higgins's face and text that said, "NO MORE HIGGINS." [*See* DE 55 at 5, Pg ID 588].

Franklin's article began by saying, "John Higgins is terrible at his job." Then, after additional commentary, the article included screenshots of tweets from former Kentucky and NBA player Rex Chapman, national sports columnist Dan Wolken, ESPN television analyst Jay Williams, and former Kentucky and current NBA

6

basketball player Karl Anthony Towns.  All the tweets were critical of the officiating in the Elite Eight game and some named Higgins explicitly.  Furthermore, the article included video clips of perceived bad calls by the officiating crew in the Elite Eight game and more commentary, including a statement that said, "Higgins' whistle didn't help UK's chances, but the blame doesn't fall on the guys in stripes." *Id.*  Franklin also said, "Blaming officials is never the way to go. But we can be critical of them, which is what I am doing right now." *Id.*

Unsurprisingly, many readers responded in the comment section below the article on KSR's website.  For instance, one person wrote, "http://www.rooferees.com/about-us/ Can we get a gofundme to put this guy on blast in Omaha?"  Another commenter stated that he put a link to Franklin's article on Higgins's website, rooferees.com.  Moreover, one of the commenters posted a link to the vimeo link of the "John Higgins [sic] Sabotage of Kentucky" video.  Still, a handful of commenters discouraged blaming the officials for the result of the game or discussed Kentucky's performance in the game more generally.

The next day, March 28, 2017, Franklin posted another article on the KSR website.  Drew Franklin, *Barleycorn's Tuesday Top 10*, Kentucky Sports Radio, Mar. 28, 2017, http://kentuckysportsradio.com/main/barleycorns-top-10/.  Near the end of the top ten, Franklin said, "**8. John Higgin's** [sic]

7

**business is getting CRUSHED on its Facebook page.**" *Id.* (emphasis in original).   Franklin said, "I won't link the page because I don't completely agree with attacking his side hustle, but, man, Big Blue Nation is destroying Higgins in the comments and reviews of the business." *Id.*   Franklin's next topic was titled "**9. Someone made a video package with all of Higgins' bad calls from the game.**" *Id.* (emphasis in original).   Franklin then said, "If you can stand to watch it, here you go . . . ," and included an embedded link to the "John Higgins [sic] Sabotage of Kentucky" video.[2] *Id.*

Again, Franklin's article elicited numerous comments from readers.   Some commenters seemed to revel in the personal attacks on Higgins and his business while other commenters indicated that they found the personal attacks abhorrent.

Around an hour after posting the second article, Franklin posted a third article.   Drew Franklin, *Talkin' Higgins, a new basketball target and more (Tuesday Show Thread)*, Kentucky Sports Radio, Mar. 28, 2017, http://kentuckysportsradio.com/main/talkin-higgins-a-new-basketball-target-and-more-tuesday-show-thread/. Franklin's article said, "It's a busy day on KSR as Matt and Ryan

---

[2] At the time of writing, the area where the video was embedded on the KSR website says: "Sorry" and "This video does not exist." Still, Franklin's article is still available on the KSR website and it appears that Franklin had embedded the link to the video from vimeo based on the title below the video that credits "cal for the win."

. . . continue the hatred for John Higgins.  They'll have that and more on two hours of Tuesday morning KSR.  **Join in on the fun by calling (502) 571-1080.**"  *Id.* (emphasis in original).  Below the article text, Franklin included a link to the iHeartRadio stream that would allow readers to listen to KSR and included a list of affiliate radio stations across Kentucky that air the KSR radio program.  *Id.*

Then, a couple minutes later, Franklin posted another article.  Drew Franklin, *Kentucky fans are really lighting up John Higgins' roofing business*, Kentucky Sports Radio, Mar. 28, 2017, http://kentuckysportsradio.com/basketball-2/kentucky-fans-are-really-lighting-up-john-higgins-roofing-business/.   Franklin's article began by saying: "We here at Kentucky-Sports-Radio-dot-com do not condone the activity from Big Blue Nation on John Higgins' roofing company's Facebook page. But like Big Blue Nation, we are still upset over some of Higgins' calls in the UK-UNC game, so we can[,] and we will *read* the activity on the Facebook page." *Id.* (emphasis in original).  The article proceeded by posting screenshots of posts on the Weatherguard Facebook page discussing John Higgins and his officiating in the Elite Eight game.  *Id.* Some of the Facebook posts reproduced in Franklin's article contain particularly foul commentary and direct attacks.  Franklin ended the article by saying, "Okay, but seriously, Big Blue Nation: maybe stop doing this. It's not a good look for us, especially the

9

handful of comments wishing death.  Let's chill just a little bit.
You can make fun of him all you want here, and we will."  *Id.*

That same day, on March 28, 2017, Jones began the KSR radio
program by discussing Weatherguard's Facebook page.  Jones stated
that he did not advocate the Facebook postings, but said, "it
doesn't mean it's not funny."  Additionally, Jones claimed that he
did not prompt the Facebook posts, saying, "you cannot blame this
on KSR. . . . Well, maybe you can because I told you he was a
roofer."  Then, Jones claims that he implored his listeners to
stop attacking Mr. Higgins's personal business.

Next, Jones proceeded to read several of the Facebook posts
on the KSR radio program.  Later, Jones said, "I can't stop reading
these John Higgins reviews," and, "It looks like ten of them are
five stars, and all the rest of them are one star."  Jones read
more Facebook posts and said he believed that fans were so upset
that they had no other way to express their frustration.
Additionally, Jones stated that he thought Higgins opened himself
up to the comments by linking his work as an official to his
company by naming his Facebook page "Rooferees."  Furthermore,
Jones acknowledged that some fans had called or tweeted saying
that they had called Weatherguard.  Jones said that these calls
were funny but then advised fans not to call Weatherguard.
Finally, Jones ended the radio program by speculating on whether

Higgins had gambled on the Elite Eight game and purposefully threw the game to North Carolina.

Shortly after the March 28 radio program, Franklin posted a fourth article, titled "Call John Higgins' business and you get the FBI (or someone pretending to be FBI)." Drew Franklin, *Call John Higgins' business and you get the FBI (or someone pretending to be FBI)*, Kentucky Sports Radio, Mar. 28, 2017, http://kentuckysportsradio.com/basketball-2/call-john-higgins-business-and-you-get-the-fbi/. Franklin began the article by saying, "It's really time to chill, BBN. Things have gotten so out of control that **if you call John Higgins' roofing business, you will be greeted by the FBI.**" *Id.* (emphasis in original). Then, Franklin said that he had called the Weatherguard telephone number and someone answered the call by saying "Federal Bureau of Investigation." *Id.* Franklin concluded by saying that Higgins's officiating performance "sucked," but that "the threats against [Higgins] and his business [were] way out of line." *Id.*

Lastly, in the evening on March 28th, John Higgins was a topic of discussion on the "Hey Kentucky" television program. The title of the Hey Kentucky episode was "Higgins Pooped on my Roof" and the segment about Higgins was called "Higgins Haters." During the television program, Jones discussed the comments on the Weatherguard Facebook page with local television personality and stand-up comedian Lee Cruse. Jones and Cruse laughed about the

11

comments on the Weatherguard page and Jones said, "We've made our point, let's move on."

**B.  Damages Suffered by Weatherguard and the Higgins Family**

According to the Plaintiffs, Weatherguard received over 3,000 telephone calls in the two days following the game.  Higgins reported that seventy-five percent of the telephone calls originated from Kentucky area codes.  These calls continued non-stop for weeks, keeping legitimate Weatherguard customers from reaching the business.

Additionally, Weatherguard's Google star rating went from 4.8 out of 5 to 1.2 out of 5 after the Elite Eight game.  The Plaintiffs claim that 181 false reviews were identified on Google.  Making matters worse, Google business searches are impacted by a company's star rating.  Thus, the bogus reviews from angered fans affected potential customers' ability to locate Weatherguard.

Furthermore, some individuals filed false reports against Weatherguard with the Better Business Bureau.  Some of the false reports were easily identified by the names that were used, such as the names of former Kentucky basketball coaches.  Moreover, Weatherguard's Facebook page apparently received over 700 false posts, resulting in Weatherguard removing the page from Facebook.

Weatherguard's contact information was also provided to businesses, such as car dealerships, resulting in follow-up calls to Weatherguard.  Additionally, Weatherguard received numerous

telephone calls from angry fans.  Weatherguard employees wasted time answering and following-up on these phone calls.

Most disturbing, however, is that some individuals contacted the Higgins family directly with nasty comments and threats.  For instance, Ms. Higgins began receiving messages pertaining to Mr. Higgins's officiating performance on her personal Facebook Messenger account.  The Higgins family also received anonymous messages at their home, including death threats and other offensive voice messages.  In response, the Sarpy County Sheriff and Omaha Police Department added patrols around the Higgins family home and Weatherguard employees were told to not work for several days.

### C.  Procedural History of Present Lawsuit

On October 3, 2017, the Plaintiffs filed a four-count complaint against the Defendants in the United States District Court for the District of Nebraska.  [DE 1].  The complaint alleged intentional infliction of emotional distress, invasion of privacy, tortious interference with a business relationship, and civil conspiracy under Nebraska law.  [*Id.*].

In response, the Defendants moved to dismiss for lack of personal jurisdiction or, in the alternative, for change of venue.  [DE 13].  On January 1, 2018, Defendants' motion was granted in part and denied in part.  [DE 20].  As a result, this action was transferred to this Court pursuant to 28 U.S.C. § 1631.  [*Id.; see also* DE 21].

Subsequently, the Defendants answered the Complaint [DE 29] and then filed a motion to dismiss [DE 40]. Then, with leave of Court, the Plaintiffs filed an amended complaint, adding claims for negligence, harassment, and engaging in harassing communications, in addition to the four original tort claims, all pleaded under Kentucky law. [DE 55].

The Defendants supplemented their motion to dismiss [DE 56]. The Plaintiffs responded in opposition to the initial and supplemental motion to dismiss. [DE 57]. Finally, the Defendants filed a reply. [DE 61]. As a result, this matter is ripe for review.

## II.  Standard of Review

In diversity cases, while the Court must apply the substantive law of the forum state, the federal pleading standards apply. *See* Fed. R. Civ. P. 81(c)(1); *Granny Goose Foods, Inc. v. Bhd. of Teamsters and Auto Truck Drivers*, 415 U.S. 423, 438 (1974) (applying the Federal Rules of Civil Procedure to removed actions); *see also Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1125 (9th Cir. 2009). A plaintiff's complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). While the plaintiff must provide sufficient facts to support his claims, he need not provide every fact that may be raised at trial. *See Scheid v. Fanny Farmer Candy Shops, Inc.*, 859 F.2d 434, 436–37 (6th Cir. 1988) ("[A]

14

complaint must contain either direct or inferential allegations respecting all the material elements to sustain a recovery under some viable legal theory." (internal quotation marks omitted)).

A motion to dismiss under Rule 12(b)(6) tests the sufficiency of the plaintiff's complaint. "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of the cause of action will not do." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citations omitted). The complaint must make factual allegations that, when accepted as true, state a plausible claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* When considering plausibility, the court construes the complaint in the light most favorable to the plaintiff. *Strayhorn v. Wyeth Pharms., Inc.*, 737 F.3d 378, 387 (6th Cir. 2013).

### III.  Analysis

Generally, the Defendants argue that the tort claims asserted against them in this action fail for two reasons. First, the Defendants move to dismiss under Federal Rule of Civil Procedure 12(b)(6), arguing that the Plaintiffs have failed to state claims

15

upon which relief may be granted. Second, the Defendants contend that the First Amendment to the United States Constitution protects their activity and that, as a result, Plaintiffs' claims are barred by First Amendment protections.

Initially, the Plaintiffs argue that Defendants' motion to dismiss pursuant to Rule 12(b)(6) is procedurally deficient as to claims brought in the initial complaint a successive Rule 12(b) motion, since the Defendants previously moved to dismiss in the District of Nebraska for lack of personal jurisdiction pursuant to Rule 12(b)(2). Additionally, the Plaintiffs maintain that they have met the minimal pleading requirements to state claims upon which relief may be granted and assert that the First Amendment does not bar the tort claims asserted against the Defendants.

To be clear, there are only two questions before the Court at this juncture: (1) Whether Defendants' motion to dismiss under Rule 12(b)(6) is procedurally sound; and, (2) if so, whether Plaintiffs' state law tort claims may survive as a matter of law. The second consideration may be broken into two parts: First, whether the Plaintiffs have stated plausible claims under Kentucky tort law; and second, whether the activity the Defendants engaged in is protected by the First Amendment, barring Plaintiffs' tort claims.

The general propriety of Defendants' actions is not a proper consideration for this Court. Whether the Defendants should have

acted differently under the circumstances is a question best left to the court of public opinion. Presently, the principal consideration before the Court is whether Plaintiffs' tort claims may proceed against the Defendants as a matter of law.

### A.    Defendants' Rule 12(b)(6) Motions

As an initial matter, the Plaintiffs argue that Defendants' initial motion to dismiss under Rule 12(b)(6) is procedurally deficient as to claims brought in the original complaint as a successive 12(b) motion after a responsive pleading. [DE 57 at 2-3, Pg ID 618-19]. In response, the Defendants provide numerous reasons why the motion to dismiss is procedurally sound.

### (1) Effect of Amended Complaint on Defendants' Initial Motion to Dismiss

Federal Rule of Civil Procedure 12(b) says that "[e]very defense to a claim for relief in any pleading must be asserted in the responsive pleading if one is required." Fed. R. Civ. P. 12(b). Still, the Rule allows for seven defenses to be raised by motion. *Id.* A motion asserting any of the specified 12(b) defenses "must be made before pleading if a responsive pleading is allowed." *Id.*

Still, Rule 12 imposes a limit on further motions, saying, "Except as provided in Rule 12(h)(2) or (3), a party that makes a motion under this rule must not make another motion under this rule raising a defense or objection that was available to the party

but omitted from its earlier motion." Fed. R. Civ. P. 12(g)(2).
But a motion to dismiss for failure to state a claim upon which
relief can be granted may be raised "in any pleading allowed or
ordered under Rule 7(a).

But here, whether Defendants' initial motion to dismiss under
Rule 12(b)(6) was a successive 12(b) motion is of no moment since
the Plaintiffs received leave to file an amended complaint.
Plaintiffs' initial complaint, filed in the District of Nebraska,
pleaded state law tort claims under Nebraska law. [DE 1 at 24-
27, Pg ID 24-27]. Of course, after this action was transferred
from the District of Nebraska to the Eastern District of Kentucky,
the ground shifted and so did the applicable law in this diversity
action. The Commonwealth of Kentucky became the forum state after
transfer and the substantive law of Kentucky now applies to as the
rule of decision. Based on the change in the procedural posture
of the action, the Plaintiffs moved for leave to file an amended
complaint. [DE 53]

Subsequently, after a status conference, the Court granted
Plaintiffs leave to file an amended complaint. [DE 54].
Plaintiffs' amended complaint superseded the original complaint,
thus making Defendants' motion to dismiss the original complaint
moot. *Kentucky Press Ass'n, Inc. v. Kentucky*, 355 F. Supp. 2d
853, 857 (E.D. Ky. 2005) (citing *Parry v. Mohawk Motors of Mich.,
Inc.*, 236 F.3d 299, 306 (6th Cir. 2000) (holding that the amended

18

complaint supersedes all previous complaints and becomes the operative pleading)); *see also Glass v. Kellogg Co.*, 252 F.R.D. 367, 368 (W.D. Mich. 2008) (explaining that a motion to dismiss claims in an original complaint is rendered moot when an amended complaint is accepted by the court).

**(2) Effect of Defendants' Supplemental Motion to Dismiss**

Still, that does not end the analysis because the Court also granted the Defendants leave to file a supplemental motion to dismiss. Plaintiffs' amended complaint rendered Defendants' initial motion to dismiss [DE 40] moot. But the procedural appropriateness of the supplemental motion to dismiss [DE 56], filed after the amended complaint, is a different matter. Plaintiffs' amended complaint not only pleaded the four tort claims in the initial complaint under Kentucky law, but also added new tort claims. [*See* DE 55 at 16-20, Pg ID 599-603]. As such, the Defendants had an obligation to respond to the amended complaint.

Here, the Defendants chose to respond to the amended complaint using a supplemental motion to dismiss in lieu of an answer. Still, while Defendants' motion to dismiss is styled as a supplemental motion, it may be more properly construed as an independent motion to dismiss the amended complaint. The Court construes filings "by their substantive content and not by their labels." *See Coleman v. Ohio State Univ. Med. Ctr.*, No. 2:11-cv-0049, 2011 WL 3273531, at *3 (S.D. Ohio Aug. 1, 2011). As a

result, the Court construes Defendants' supplemental motion to dismiss [DE 54] as a motion to dismiss the amendment complaint and will address the substantive arguments raised in that motion.

## B.  Plaintiffs' Tort Claims

In the amended complaint, the Plaintiffs bring seven tort claims arising under the laws of the Commonwealth of Kentucky.  In the motion to dismiss, the Defendants argue that the First Amendment to the United States Constitution proscribes tort liability for speech addressing matters of public concern. Furthermore, the Defendants contend that the three tort claims added to the amended complaint fail as a matter of law.

### (1)  Federal Pleading Standards

Plaintiffs' Amended Complaint alleges that the Defendants committed seven torts, they are: (1) intentional infliction of emotional distress, (2) invasion of privacy, (3) tortious interference with a business relationship or expectancy, (4) negligence, (5) harassment, (6) engaging in harassing communications, and (7) civil conspiracy, aiding and abetting, and complicity.

Interestingly, the Plaintiffs did not plead a claim for defamation.  In the response in opposition to the motion to dismiss, the Plaintiffs use language such as "actual malice" and "public figure" that are generally understood to be part of a defamation analysis involving a public figure.  Still, while the

20

Plaintiffs were not required to plead every fact that may be raised at trial, they are required to provide "a short and plain statement of the claim." Fed. R. Civ. P. 8(a)(2). Plaintiffs have provided no short or plain statement in their amended complaint indicating that they are raising a claim of defamation. As such, it appears that Plaintiffs made a strategic decision not to bring a claim of defamation against the Defendants.

As was previously discussed, this case has an abnormal procedural posture. Plaintiff originally brought claims for intentional infliction of emotional distress, invasion of privacy, tortious interference with a business expectancy, and civil conspiracy under Nebraska law. [*See* DE 1]. After the case was transferred from the District of Nebraska to the Eastern District of Kentucky, the Defendants argued that the Plaintiffs had failed to state claims based on the federal pleading standards for the four initial claims under Kentucky law. [*See* DE 40]. Subsequently, the Plaintiff amended their complaint with leave of court, pleading the four original tort claims under Kentucky law and adding new tort claims. The amended complaint made Defendants' first motion to dismiss moot.

In the supplemental motion to dismiss, the Defendants argued the First Amendment is a complete bar to all the pleaded tort claims and alternatively, that the Plaintiffs had failed to meet federal pleading standards on the new tort claims in the amended

21

complaint. As such, the Defendants have technically only alleged that the new claims brought by the Plaintiffs, negligence, harassment, engaging in harassing communication, and aiding and abetting, fail as a matter of law under the federal pleading standards.

As a general rule, "[o]ur adversary system is designed around the premise that the parties know what is best for them, and are responsible for advancing the facts and arguments entitling them to relief." *Castro v. United States*, 540 U.S. 375, 386 (2003) (Scalia, J., concurring in part and concurring in the judgment); *see also United States v. Samuels*, 808 F.2d 1298, 1301 (8th Cir. 1987) (R. Arnold, J., concurring in denial of reh'g en banc) ("[Courts] do not, or should not, sally forth each day looking for wrongs to right. We wait for cases to come to us, and when they do we normally decide only questions presented by the parties.").

Normally, the doctrine of constitutional avoidance would counsel this Court to consider whether Plaintiffs' claims fail to meet federal pleading standards before addressing First Amendment arguments. The doctrine of constitutional avoidance implores courts to avoid constitutional determinations when other grounds exist for the disposition of a case. *See Ashwander v. Tenn. Valley Auth.*, 297 U.S. 288, 347 (1936) (Brandeis, J., concurring) ("It is not the habit of the court to decide questions of a constitutional nature unless absolutely necessary to a decision of the case.")

(internal citation and quotations marks omitted).  But here, since Defendants' most recent motion to dismiss only alleged that the three most recent state tort claims pleaded by the Plaintiffs fail to satisfy federal pleading standards, the Court must necessarily address the constitutional arguments.  As a result, Defendants' defenses based on the First Amendment are considered below.

## (2)   Effect of First Amendment Protections on Plaintiffs' Tort Claims

Defendants' primary argument in their second motion to dismiss is that the alleged tortious speech is protected by the First Amendment to the United States Constitution.  The Free Speech Clause of the First Amendment says, "Congress shall make no law . . . abridging the freedom of speech."  U.S. Const. amend. I.  The First Amendment has been incorporated against the states based on the Due Process Clause of the Fourteenth Amendment, requiring that states also protect the freedom of speech.  *Gitlow v. New York*, 268 U.S. 652, 666-667 (1925) ("For present purposes we may and do assume that freedom of speech and of the press—which are protected by the First Amendment from abridgment by Congress—are among the fundamental personal rights and 'liberties' protected by the due process clause of the Fourteenth Amendment from impairment by the States.").

In some limited circumstances, restrictions on speech may be permitted.  For instance, the well-defined and narrow exceptions

to freedom of speech include obscenity, *Roth v. United States*, 354 U.S. 476, 483 (1957), defamation, *Beauharnais v. Illinois*, 343 U.S. 250, 254-255 (1952), fraud, *Virginia Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 771 (1976), incitement, *Brandenburg v. Ohio*, 395 U.S. 444, 447-449 (1969) (per curiam), and speech integral to criminal conduct, *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 498 (1949). Otherwise, courts have been hesitant to restrict speech, regardless of form, even if that speech is offensive or painful.

**a. The First Amendment as a Bar to Tort Liability**

While the First Amendment protects speech that is positive, agreeable, and uplifting, the First Amendment's defense of free speech also extends to speech that is distressful, hurtful, offensive, and nasty. The general solution to speech that is distasteful, hurtful, or disparaging is more speech to the contrary in the marketplace of ideas.

This case presents a classic collision of rights situation. On one hand, the Plaintiffs assert their right to privacy and to be left alone. On the other hand, the Defendants assert their right to speak freely and openly.

Contrary to Plaintiffs' contention that the First Amendment does not provide "cover" for Defendants' tortious activity, the First Amendment may serve as a defense in state tort suits in some situations. *See, e.g.*, *Hustler Magazine, Inc. v. Falwell*, 485

24

U.S. 46, 50–51 (1988).  As a general legal maxim, individuals may not use tort actions to abridge and chill the freedom of speech protected by the First Amendment.

> **b.  Special Protections for Speech of Public Concern**

Whether the First Amendment prohibits holding these Defendants liable for their speech will turn primarily on whether the speech is of public concern, as determined by the circumstances of this case.  *See Snyder v. Phelps*, 562 U.S. 443, 451 (2011).  "[S]peech on 'matters of public concern' ... is 'at the heart of the First Amendment's protection.'"  *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 758–759 (1985) (opinion of Powell, J.) (quoting *First Nat. Bank of Boston v. Bellotti*, 435 U.S. 765, 776 (1978)).  "The First Amendment reflects 'a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open.'"  *Snyder*, 562 U.S. at 452 (quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964)).  As a result, "speech on public issues occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection." *Connick v. Myers*, 461 U.S. 138, 145 (1983) (internal quotation marks omitted).

In this case, the Defendants argue that the First Amendment bars the tort claims asserted by the Plaintiffs because the allegedly tortious conduct only involves speech on matters of public concern.  In response, the Plaintiffs argue that Defendants'

speech went beyond matters of public concern and that Defendants directly engaged in activity that imposes tort liability. The Plaintiffs note that Defendants did not simply limit their speech to discussion of the Elite Eight basketball game or Mr. Higgins's officiating performance, but also called Weatherguard's business phone number on one occasion, shared the commentary of other third-parties, and induced others to act badly. Finally, the Plaintiffs argue that the Defendants primarily rely on case law involving a First Amendment defense to the tort of intentional infliction of emotional distress.

The Plaintiffs are correct that the *Snyder* opinion was limited to the particular facts before the court and primarily dealt with the tort of intentional infliction of emotional distress. *See Snyder*, 562 U.S. at 460. In *Snyder*, the Supreme Court held that the First Amendment shielded members of the Westboro Baptist Church who protested near the funeral of a military service member from liability for intentional infliction of emotional distress. *Id.* at 443-61. In so holding, the Supreme Court found that the speech of the protestors, even though extremely painful for the service member's family, was protected by the First Amendment because the speech was in a public place and the messages highlighted matters of public concern, including the fate of our Nation, homosexuality, and issues involving the military. *Id.* at 454-59.

Still, the legal concept announced by the Court in *Synder* is not as limited as the Plaintiffs assert and applies to analogous situations where a lawsuit seeks to impose tort liability for speech dealing with a matter of public concern. The *Snyder* opinion stands for the principle that the First Amendment may bar state law tort claims in certain factual circumstances when the alleged tortious conduct is speech on a matter of public concern in a public place or forum. As such, the legal principle from *Snyder* does not appear to be limited to tort actions for intentional infliction of emotional distress because it seems that the outcome would have been the same in *Snyder* even if the tort claim pleaded had been invasion of privacy or negligence.

In fact, other courts have used *Snyder* to evaluate whether the First Amendment bars tort claims in other contexts. For instance, in *Nwanguma v. Trump*, the United States Court of Appeals for the Sixth Circuit employed the Snyder framework to determine whether then candidate Donald Trump's words at a campaign event constituted incitement to riot. 903 F.3d 604 (6th Cir. 2018). In holding that Trump's words did not constitute incitement to riot, the Sixth Circuit cited *Snyder* and examined the factual content, form, and context of Trump's speech. *Id.* at 611-13. Additionally, the Sixth Circuit observed that "[i]n order to provide adequate breathing space for public debate, the [Supreme] Court observed, the First Amendment requires government tolerance of insulting and

27

even outrageous speech." *Id.* at 612 (citing *Snyder*, 562 U.S. at 458). Thus, the Sixth Circuit has employed the *Snyder* framework in other circumstances to determine if speech on a matter of public concern is protected by the First Amendment.

As a result, in this case, the Court must make an independent examination of the whole record and review the content, form, and context of the speech that the Defendants engaged in to determine if the speech falls within one of the "'narrowly limited classes of speech' that do not enjoy First Amendment protection." *Id.* (quoting *Hess v. Indiana*, 414 U.S. 105, 107 (1973)). In performing this examination, the Court accepts all well-pleaded factual allegations in the complaint as true but is "not required to accept legal conclusions masquerading as factual allegations." *Id.* at 611 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

**(1)  Speech on a Matter of Public Concern**

"Speech deals with matters of public concern when it can be fairly considered as relating to any matter of political, social, or other concern to the community, . . . or when it is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public." *Snyder*, 562 U.S. at 453 (internal citations and quotation omitted). In deciding whether speech is of public or private concern, courts must "examine the content, form, and context of that speech, as revealed by the whole record." *Id.* (internal citations and quotations omitted). When

considering content, form, and context, "no factor is dispositive, and it is necessary to evaluate all the circumstances of the speech, including what was said, where it was said, and how it was said." *Id.* at 454. Finally, whether the character of the statement was inappropriate or controversial "is irrelevant to the question whether it deals with a matter of public concern." *Rankin v. McPherson*, 483 U.S. 378, 387 (1987).

**(2) Whether Defendants' Speech Pertained to Matters of Public Concern**

At present, the parties do not appear to dispute that the Elite Eight basketball game and John Higgins's officiating performance in that game are matters of public concern. The Plaintiffs assert, however, that other speech and commentary by the Defendants did not involve matters of public concern and was instead intended to harm the Plaintiffs. Specifically, the Plaintiffs allege that Mr. Jones acted with actual malice and that the Defendants published statements from third-parties that they knew were false, inciting others to contact the Plaintiffs and comment on the Weatherguard Facebook page.

**i.  Content and Form**

The content of Defendants' speech[3], while varied, was broadcast on radio, television, and the KSR public webpage and was primarily related to the John Higgins's officiating performance in the Elite Eight game, the name of Weatherguard's website and Facebook page, and the post-game reaction by third-parties. Initially, Defendants' commentary involved a discussion of the officiating during the Elite Eight game, with particular emphasis on the perceived poor performance of Mr. Higgins while officiating the game. [*See* DE 55 at 4, Pg ID 587].

Still, Defendants' speech quickly transitioned to coverage and commentary of the reaction of other third parties, even though the emphasis continued to be on John Higgins. On March 27, 2017, Defendant Matt Jones frequently discussed Higgins's officiating performance in the Elite Eight game on his radio program. [*Id.*]. Jones read emails from listeners stating that the viewers were going to post poor reviews about Weatherguard online. [*Id.*].

Jones also announced the name of Weatherguard's webpage, "Rooferees" on the air, spelling the name for listeners. [*Id.* at 5, Pg ID 588]. But Jones ended the conversation by saying, "Now I still don't think you should troll the guy but now I have less sympathy if his [company's] name is Rooferees." [*Id.*].

---

[3] A more detailed recitation of the relevant facts, including a more through analysis of the content and context of Defendants' speech, is included in Part I above.

30

Much of Defendants' speech was made in articles written by Defendant Drew Franklin and posted on the KSR website. For instance, one of the articles, titled "No more John Higgins please," contained a photo of Higgins in his officiating uniform with the international prohibition sign over Higgins's face with text that said, "NO MORE HIGGINS." This article said that John Higgins was terrible at his job and included tweets from other high-profile sports commentators and basketball players that were critical of Higgins's officiating performance. Finally, the article ended with video clips of perceived bad calls by the officiating crew in the Elite Eight game, including a statement that said, "Higgins' whistle didn't help UK's chances, but the blame doesn't fall on the guys in stripes." [*Id.*].

Another article was posted on the KSR website that said in part, "John Higgin's [sic] business is getting CRUSHED on its Facebook page." Franklin said, "I won't link [to] the page because I don't completely agree with attacking his side hustle, but, man, Big Blue Nation is destroying Higgins in the comments and reviews of the business."

Then, in the same article, Franklin said, "Someone made a video package with all of Higgins' bad calls from the game." The referenced video was embedded on the same page as the article. The video, titled "John Higgins [sic] Sabotage of Kentucky," was initially uploaded by an unknown creator the vimeo.com and was

31

publicly available.   Most of the video contains replays of television footage of the Elite Eight basketball game between Kentucky and North Carolina.  At the end of the video, a photo of John Higgins is included alongside Weatherguard's telephone number, Weatherguard's website URL, the Higgins' home telephone number, and a message that said, "Write a review of him here http://www.facebook.com/rooferees."  Finally, in a later article, Franklin admitted that he called the Weatherguard business telephone number and someone claiming to be from the FBI answered the call.

Defendants' additional coverage and commentary proceeded in a similar vein.  A third article on the KSR website encouraged readers to tune into the March 28, 2017, KSR radio broadcast to "continue the hatred for John Higgins."  On the March 28th radio broadcast, Jones discussed John Higgins frequently and read negative reviews from angry fans on the Weatherguard Facebook page. Jones also acknowledged that some listeners had admitted to calling Weatherguard's telephone number.   Jones also speculated about whether Higgins was gambling on the Elite Eight game and purposefully threw the game to North Carolina.   Finally, Jones discussed Higgins on the "Hey Kentucky" television program in a segment called "Higgins Haters."

Still, all the while, the Defendants, while acknowledging that they found some of the posts and reviews funny, discouraged

their viewers and listeners from contacting Higgins or his business. In fact, Franklin said that while he though Higgins's officiating performance "sucked," he also felt that "the threats against [Higgins] and his business [were] way out of line." Similarly, Jones told fans that, "We've made our point, let's move on."

**ii. Context**

Contrary to the assertion by the Plaintiffs that the game was inconsequential, college basketball is a big business and fans across the country take the game quite seriously. In fact, college basketball is a multi-billion-dollar industry in the United States. Dave Davies, *Corruption, Scandal and The Multi-Billion Dollar Business of College Basketball*, NATIONAL PUBLIC RADIO, Oct. 25, 2018, https://www.npr.org/2018/10/25/660499130/corruption-scandal-and-the-multi-billion-dollar-business-of-college-basketball (transcribed radio interview with Michael Sokolove). College basketball is commonly aired live on television and is covered on news programs. Many individuals pay significant amounts of money to attend college basketball games and thousands of individuals are employed as coaches, trainers, commentators, and officials for college basketball. Finally, many arenas, companies, and local economies enjoy direct and indirect financial benefit from college basketball games and programming.

Additionally, the main event of NCAA men's college basketball is the "March Madness" NCAA tournament.  There are entire shows dedicated to this event.  Furthermore, many people participate in March Madness bracket pools and contests.  In 2017 alone, approximately ninety-seven-million viewers watched parts of the NCAA March Madness tournament.  *Id.*

Furthermore, the Plaintiffs all enjoyed some direct and indirect benefit from John Higgins's status as a well-known college basketball official.  Directly, Higgins made money from his work as a NCAA men's college basketball official and gained notoriety from his high-profile and frequent officiating assignments.  *See* Seth Davis, *Up in the Air: John Higgins is one of the nation's most visible, wanted—and loathed—basketball referees*, Sᴘᴏʀᴛs Iʟʟᴜsᴛʀᴀᴛᴇᴅ, Jan. 28, 2016, https://www.si.com/college-basketball/2016/01/28/ncaa-basketballs-most-recognized-referee-well-traveled-john-higgins.  Indirectly, Higgins utilized his notoriety as a high-profile college basketball official to market his roofing business by using the name "Rooferees" on the Weatherguard website and Facebook page.

Ultimately, NCAA men's basketball, and the NCAA March Madness tournament in particular, is not inconsequential.  Obviously, college basketball is an important sport and business for all parties involved in the present lawsuit.  Additionally, millions

34

of Americans engage with the sport of men's college basketball in numerous ways, whether as casual observers or die-hard fans.

Moreover, Defendants' speech occurred close in time to the Elite Eight game.  The Elite Eight game between Kentucky and North Carolina occurred on March 26, 2017.  Most, if not all, of the allegedly tortious speech in which the named Defendants engaged occurred between March 26, 2017, right after the game, and March 28, 2017.  As a result, the Elite Eight game was certainly still fresh on the mind of many viewers and commentators during the period in question.

**(3)  The Speech of the Defendants was on a Matter of Public Concern and Enjoys Special Protection Under the First Amendment**

Here, after construing all facts in Plaintiffs' complaint as true and considering the content, form, and context of the allegedly tortious speech, Defendants' speech was publicly distributed and involved matters of public concern.  As a result, Defendants' speech deserves special protection under the First Amendment.

The Plaintiffs claim that the much of Defendants' speech transcended the boundaries of matters of public concern and invaded their personal privacy.  But matters of public concern are not as limited as the Plaintiffs contend.  Matters of public concern are not limited to matters of political or governmental concern, but also include matters of social or general news interest.

35

First, the content of the speech—the Elite Eight basketball game—including John Higgins's officiating performance in that game and the subsequent reaction of fans—were all matters of public concern. Public concern pertaining to the Elite Eight game and the performance of certain parties to that game, including officials, does not cease at the final buzzer. Of course, the game itself is clearly a matter of public concern, but so is the post-game analysis and reaction. In fact, many post-game shows and analyses regularly involve analysts reviewing and commenting on potentially questionable calls made by officials during crucial periods of the game. Additionally, here, the subsequent reaction of fans posting fake reviews about Weatherguard and contacting the Plaintiffs eventually became part of the overall news story about the game and was widely reported in the local and national media.

In response, the Plaintiffs claim that the Defendants intentionally fanned the flames of discord and indirectly recruited and incentivized an army of upset fans to attack the Plaintiffs in retribution for perceived poor officiating by Higgins. Of course, some individuals listening to Defendants' programming may have felt emboldened or encouraged to publicly express their anger toward Higgins. But to hold the Defendants responsible for these third-party actions would potentially quell open debate and commentary on public events and issues.

Furthermore, the Defendants counseled their viewers and listeners against contacting the Plaintiffs. The Plaintiffs claim that this discouragement was disingenuous, and maybe so, because the Defendants laughed approvingly at some of the negative comments and reviews just before or after discouraging people from engaging in similar behavior. Still, the fact that the Defendants expressed their disapproval of the actions of some viewers and fans cannot be ignored in the entire context of the speech in question.

Finally, much of Defendants' speech, particularly the speech with which the Plaintiffs take issue, involved the Defendants discussing and commenting on the speech of others. For instance, the Defendants embedded a video containing Plaintiffs' contact information, including the Higgins' home telephone number. Still, the video that the Defendants posted was publicly available online for any viewer to see and much of the video simply contained clips of television coverage from the Elite Eight game. Additionally, the Defendants read and commented on many fake reviews and posts about the Plaintiffs. Still, these comments were either posted on public websites and social media platforms or emailed to the Defendants by third-parties. As a result, to the extent that any of the speech or conduct alleged in the complaint is actionable under the tort claims pleaded in Plaintiffs' complaint, it is the speech of unnamed third-parties, not the named Defendants in this action.

Second, the form of the speech supports a finding that the speech at issue here related to matters of public concern. All of Defendants' speech was broadcast orally on the KSR radio program, on the "Hey Kentucky" television program on a local NBC affiliate station, or in written form on the KSR website. All these forms of media are widely broadcast and available to the public. Of course, the Plaintiffs question the journalistic integrity of the Defendants but that is of no moment in this analysis. One need not be a Pulitzer Prize winning journalist to speak on a matter of public concern in a public forum.

Of course, just because speech is on a matter of public concern does not categorically entitle that speech to First Amendment protection in all circumstances. Thus, "[e]ven protected speech is not equally permissible in all places and at all times." *Frisby v. Schultz*, 487 U.S. 474, 480 (1988).

Still, the Defendants in this action engaged in speech on a radio program, a local television program, and a public website. Defendant Franklin directly contacted the Plaintiffs once, by placing a phone call to the publicly available Weatherguard telephone number and immediately ending the call. Otherwise, the named Defendants never directly contacted or interfered with Plaintiffs' business or personal lives. Additionally, while the Defendants may not have gone to great lengths to discourage the third-party behavior at issue here, they certainly did not make

38

anyone contact the Plaintiffs directly or encourage viewers to make death threats toward the Plaintiffs.

Third, and finally, the context of the speech at issue here supports a finding that the speech in question pertained to matters of public concern. Most of the speech by the named Defendants as alleged in the complaint occurred within roughly forty-eight hours after the Elite Eight game. The speech concerned the outcome of that game, including the impact of the officiating. Additionally, Defendants' speech included commentary about John Higgins, a well-known NCAA college basketball official who officiated in the Elite Eight game, and his business, Weatherguard, which was associated with his officiating based on his use of the title "Rooferees" on the Weatherguard website and social media platforms. Finally, the Defendants discussed post-game reaction by angry fans by discussing and reading angry posts targeting John Higgins and his business.

Ultimately, while some of this discussion, particularly regarding Weatherguard and the fake online posts, may not be directly related to the game, all of Defendants' speech is still related to the Elite Eight game and subsequent post-game reaction. The discussion about John Higgins, his business, and the reaction of angry fans was all part of a continuing post-game news story.

As a result, seeing as Defendants' speech pertained to matters of public concern and was broadcast on public media platforms, the

speech enjoys special protection under the First Amendment and Plaintiffs' tort claims must not be permitted to silence this protected speech.   And for good reason.   The First Amendment provides an outlet for individuals who feel aggrieved to alleviate their anger and frustration by voicing their opinions and concerns in a public forum without fear of retribution.   Here, the outcome of the Elite Eight game clearly evoked a passionate response from many fans and observers.   The free speech protections of the First Amendment, within reason, allowed these individuals to express their frustration without resorting to violence or other unlawful behavior, even if the speech was unpleasant.

Of course, that is not to say that the Plaintiffs do not have valid tort claims against the third-parties who directly contacted, harassed, and made false comments about them.   Here, there is no doubt that some of the fans and third-parties crossed the line of both common decency and are potentially open to civil liability for their actions.   Still, the conduct of the named Defendants involves speech concerning matters of public concern in public and allowing the claims in this action to move forward, even to discovery, would "constitute a forbidden intrusion on the field of free expression." *New York Times Co. v. Sullivan*, 376 U.S. 254, 285 (1964).   As a result, the Plaintiffs have failed to plead claims upon which relief may be granted and claims pleaded in Plaintiffs' complaint must be dismissed as a matter of law.

40

**(3)   The Kentucky Constitution as a Bar to Plaintiffs' Claims**

Additionally, while not explicitly addressed or argued by the parties, the free speech protections found in the Kentucky Constitution may also bar the tort claims pleaded in Plaintiffs' complaint. The Constitution of the Commonwealth of Kentucky provides similar protections for freedom of speech. Section 1 of the Kentucky Constitution protects "[t]he right of freely communicating [one's] thoughts and opinions." Ky. Const. § 1. Furthermore, Section 8 of the Kentucky Constitution expressly protects the rights of freedom of speech and of the press. Ky. Const. § 8. It does not appear that the Kentucky Supreme Court has directly addressed the question of whether state law tort claims seeking to impose liability for speech on matters of public concern may go forward considering the protections for free speech found in the Kentucky Constitution.

In *Champion v. Commonwealth*, the Kentucky Supreme Court quoted *Snyder* for the principle that "Public forums enjoy a 'special position in terms of First Amendment protection' because of the critical role they play in fostering public debate, expression, and assembly." 520 S.W.3d 331, 335 (Ky. 2017) (quoting *Snyder*, 562 U.S. at 443). The Kentucky Supreme Court went on, saying, "The true beauty of the First Amendment is that it treats both Cicero and the vagabond as equals without prejudice to their message. Freedom of speech does not exist for us to talk about the

41

weather; to accept this liberty is to welcome controversy and to embrace discomfort." *Id.* at 338. Finally, in holding that a local ordinance prohibiting panhandling on public sidewalks was subject to strict scrutiny and was ultimately unconstitutional under the First Amendment to the United States Constitution, the Court stated that "[t]here is rarely a constitutionally valid reason for the government to filter the topics for public discourse." *Id.*

Furthermore, in *J.C.J.D. v. R.J.C.R.*, while citing both the United States and Kentucky Constitutions, the Kentucky Supreme Court found that state law restrictions affecting free speech that may result in disciplinary action to the speaker are subject to strict scrutiny. 803 S.W.2d 953, 954-55 (Ky. 1991). In the same case, the Kentucky Supreme Court found that a Code of Judicial Conduct provision that prohibited judicial candidates from discussing their views on a disputed legal or political issue violated the free speech rights of judicial candidates. *Id.* at 956-57.

Applying these principles to the case at bar leads one to the logical conclusion that, at least in most circumstances, state law tort claims that impose civil liability on a speaker expressing an opinion on or discussing a matter of public concern in a public forum also run afoul of the free speech protections found in the Kentucky and United States Constitutions. If local ordinances limiting speech on public sidewalks are unconstitutional

42

restrictions on free speech, then it follows that a lawsuit for invasion of privacy based on the same conduct would also impose an unconstitutional restriction on free speech. Moreover, if punishing judicial candidates for speaking on matters of public concern violates constitutionally protected free speech then surely a lawsuit for intentional infliction of emotional distress arising from the same conduct would be similarly barred.

Ultimately, the free speech protections in the Kentucky Constitution appear to parallel federal free speech protections and, as a result, the Kentucky Constitution likely bars the tort claims raised by the Plaintiffs in the present action. Still, since the United States Constitution serves as the floor of substantive rights protections, the Kentucky Constitution may provide additional protections for free speech not found in the United States Constitution. Regardless, since Defendants' conduct is protected by the First Amendment to the United States Constitution, this Court need not determine whether the Kentucky Constitution provides additional protections that bars the tort claims pleaded here.

## IV. Conclusion

After reviewing the entire record and considering the content, form, and context of the allegedly tortious speech at issue in this case, Defendants' speech was broadcast publicly on the radio, television, and online, and was related to matters of

43

public concern.  Thus, the speech in which the Defendants engaged is entitled to special protection under the First Amendment to the United States Constitution.  As a result, the tort claims alleged by the Plaintiffs must be dismissed in their entirety because they constitute a forbidden intrusion on the field of free expression. To hold otherwise would pose a threat to free and robust debate of public issues.

Of course, creative minds may ponder a perpetual parade of horribles and infinite slippery slope arguments as a result of this holding.  This Court is sensitive to the real problem imposed by cyberbullying, especially in the age of social media. Furthermore, context, debate, and reflection may be lost with the ability to instantaneously post a video or story online or on social media.  Here, there appears to be no doubt that the Plaintiffs in this action suffered genuine harm and discomfort as a result of the some of the speech alleged in the complaint. Moreover, this clash of rights necessarily requires some imposition on the right to privacy.  Regardless, the holding does not necessarily render the Plaintiffs helpless.

It is crucially important to take note of what this opinion does not hold.  First, this opinion does not hold that the Plaintiffs do not have an action for defamation against these Defendants.  Defamation was not pleaded in the complaint and therefore defamation was not considered here.  Second, this opinion

44

does not hold that all speech on matters of public concern is protected from tort liability. Each case is unique and requires an individual review of the content, form, and context of the speech at issue. Third, this opinion does not necessarily prevent the Plaintiffs from bringing the claims pleaded in this complaint against unnamed third parties. The Plaintiffs may be able to bring claims for intentional infliction of emotional distress, invasion of privacy, and other related torts against the individuals who made threats and contacted them directly. Fourth, and finally, this opinion does not indicate that the Court condones or approves of the actions of the Defendants. Again, whether the Defendants acted badly based on general principles of common decency and journalistic ethics was not an appropriate consideration for this Court. Individuals and corporate entities are not automatically subjected to tort liability just because they act indecently or immorally.

In sum, the narrow holding here is that, based on the facts pleaded in the complaint, the named Defendants engaged in speech on matters of public concern on radio, television, and on the internet. Since speech on matters of public concern in a public place is entitled to special First Amendment protection, the Plaintiffs have not pleaded claims upon which relief may be granted and the tort claims pleaded in the complaint must be dismissed.

Accordingly, **IT IS ORDERED** as follows:

(1) The Court construes Defendants' supplemental motion to dismiss [DE 56] as a motion to dismiss the amended complaint;

(2) Defendants' motion to dismiss [DE 56] is **GRANTED**;

(3) The claims in Plaintiffs' amended complaint [DE 55] are **DISMISSED WITH PREJUDICE**;

(4) A judgment consistent with this opinion will be entered separately.

This the 20th day of March, 2019.

Signed By:

*Joseph M. Hood*

Senior U.S. District Judge